INEZ GUMBS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gumbs v. Commissioner
Docket No. 29606-81.
United States Tax Court
T.C. Memo 1984-666; 1984 Tax Ct. Memo LEXIS 1; 49 T.C.M. (CCH) 369; T.C.M. (RIA) 84666; December 27, 1984. Inez Gumbs, pro se. Nancy M. Vinocur, and William M. Gross, for the respondent. SWIFT MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent determined the following deficiencies in and additions to petitioner's Federal income tax liabilities: Additions to Tax
Year
Deficiency
Sec. 6653(a) [1]
1973
$84,769.56
$4,238.48
1974
67,768.81
3,388.44
1975
26,688.07
1,334.40
The issues before the Court are whether funds that became available to *2 petitioner during the years at issue for use in her liquor store were non-taxable loans or taxable receipts from the liquor store, and whether any part of the alleged underpayment of taxes for the years at issue was due to negligence under section 6653(a). On audit, respondent made an analysis of petitioner's bank accounts and determined that all funds deposited therein were taxable receipts from petitioner's liquor store. Petitioner contends that the funds deposited to her bank acounts in excess of the total liquor store receipts reported on her tax returns for each year were non-taxable loans from friends, relatives, and a bank. The trial in this case was held in New York City on January 20, 1984. Some of the facts have been stipulated and are so found. Petitioner Inez Gumbs was a resident of New York City at the time she filed the petition herein. Petitioner timely filed her Federal income tax returns for the years 1973, 1974, and 1975. During the years at issue, petitioner was the sole proprietor of a retail liquor store in New York City. Petitioner's liquor license was obtained by her husband some time around 1945. When petitioner's husband died sometime in *3 the 1950's petitioner operated the liquor store by herself. During the late 1960's and early 1970's, petitioner's store became unprofitable and her long-time friend, Edward Brooks (hereinafter referred to as "Edward"), who also was the owner of a retail liquor store, pursuaded petitioner to move her liquor store to a better location in New York City. Edward did not have any immediate family since his wife had died during the mid 1960's, and he and his wife did not have any children. In addition to the liquor store, Edward owned realty and was considered a wealthy man. Petitioner's liquor store continued to be unprofitable even after it was relocated. By that time petitioner had given up her apartment and had moved in with her brother, then a Justice of the Supreme Court of New York, and lived rent-free as his housekeeper. Petitioner considered selling her business, however Edward persuaded her not to do so. The business was petitioner's sole source of support, and Edward assured her that he would loan her the necessary funds until her business became profitable. In that regard, in late 1972, Edward transferred to petitioner $100,000 in cash for use in her business during *4 1973 and continued to transfer to her additional funds until his death in 1975. Petitioner approximated that Edward transferred to her at least $300,000 for use in her business during the years at issue. Petitioner testified that her agreement with Edward was to repay him when her business again became profitable. In addition to receiving the above funds from Edward, petitioner also received various gifts from him, although he never filed gift tax returns during the years at issue. Petitioner also received funds from relatives during the years at issue for use in her business. She understood that the funds received from relatives were to be repaid. Funds were received from her sister-in-law, daughter-in-law, and from her brother. From her sister-in-law she received $3,000, and she repaid that amount approximately six months later on April 8, 1973. Petitioner received $5,000 from her daughter-in-law on March 15, 1975, and repaid that amount. Petitioner made partial repayments to her brother of the funds received from him. In addition to receiving funds from friends and relatives, petitioner received two loans from Manufacturer's Hanover Trust Company (hereinafter *5 referred to as "Manufacturer's Hanover"). The first bank loan was made on August 7, 1973, in the amount of $33,276, and the second bank loan was made on September 25, 1974, in the amount of $25,007.76. Petitioner repaid both of those loans. Respondent now concedes the existence of the first bank loan and that deposits to petitioner's bank accounts were non-taxable to that extent. Respondent also concedes the existence of the second bank loan but still asserts that the amount thereof was not deposited into petitioner's bank accounts. Thus, in his bank account analysis, respondent has conceded the non-taxable nature of the proceeds of the first bank loan, but not of the proceeds of the second bank loan. Petitioner's general procedures with respect to the funds described were as follows.When petitioner received the funds she would place them in a safe which was built into a desk in the liquor store. Petitioner recorded the funds received in a notebook and kept a record of who transferred the funds to her. Petitioner kept the notebook in an empty liquor certon in her store in which she also kept her other business records (namely, bank statements, checkbooks, a daily *6 sales record, cash register tapes, and deposit slips). When expenses of the store were paid, petitioner would withdraw the funds needed from the safe and deposit them into one of her two checking accounts, either at Manufacturer's Hanover or at Chase Manhattan Bank. Of the $33,276 proceeds from the 1973 bank loan, however, $30,559.99 was not put into her safe but was deposited by petitioner directly into her checking account at Manufacturer's Hanover. During March of 1974, Edward was declared mentally incompetent, and his brother, Byron Brooks, was named conservator of Edward's assets during the period of his incompetence. Nevertheless, Edward continued to transfer funds to petitioner, unbeknown to Byron Brooks. Edward died on July 11, 1975, and the accounting for his estate reflected assets valued at $193,244, including $17,694 in a checking account, $73,050 in savings, and $77,000 in realty. Byron Brooks was the administrator of Edward's estate. Petitioner testified that Byron Brooks, who also is now deceased, did not know about the transfers of funds that she had received from Edward for two reasons. First, Edward apparently did not tell anyone about the transfers *7 due to the regulatory laws in New York State prohibiting loans between owners of two liquor stores. Second, petitioner did not tell the administrator about the transfers because at the time of Edward's death she did not have the funds to repay Edward due to the fact that the store was still incurring losses. On or about December 9, 1975, the first of two burglaries occurred at petitioner's liquor store. The burglars initially entered the building next door to petitioner's store, broke through the common wall and entered petitioner's store. During the first burglary very little merchandise was stolen because petitioner's guard dog surprised the burglars. Petitioner reported the burglary to both the police and the landlord, and the hole in the wall was temporarily boarded over. The very next night the burglars returned, drugged petitioner's guard dog and stole approximately 12 to 15 liquor cartons. One of the liquor cartons that was stolen was the one that contained petitioner's records, including the notebook in which she had recorded the funds that she had received. Although the carton that held petitioner's records did not weigh as much as a liquor carton, in the burglars' *8 haste this fact apparently went unnoticed. Petitioner filled out a police report of the burglary that is in evidence and that indicated that a checkbook, paid bills, and invoices were stolen. After Edward's death, petitioner continued to require additional funds to keep her business operating and received funds from her brother. Petitioner's need for funds continued until she sold the liquor store in 1979 for $75,000. Petitioner used the $75,000 to pay back some of her debts, including amounts that she had received from her brother. Section 61 defines gross income as including "all income from whatever source derived." A liberal construction has been given by the Supreme Court to the term "income" in section 61 "in recognition of the intention of Congress to tax all gains except thos specifically exempted." . Therefore, if an item of income does not fall either within the statutory or judicial exclusions, it is properly includible in the taxpayer's gross income. It is well established that loans received by taxpayers are excludible from gross income. ; *9 . Whether amounts received were bona fide loans is a question of fact to be determined from all the surrounding facts and circumstances. . An important factor in that determination is whether the taxpayer intended to repay the lender, and whether the lender intended to enforce the obligation. . The ascertainment of that intent, however, is "frequently difficult, and [the taxpayer's] true intention is to be determined not only from the direct testimony as to intent but from a consideration of all the evidence." . Additional factors considered in the determination of whether amounts received were bona fide loans are whether there was a business purpose for making the loans, whether the parties were dealing at arm's length, whether the loans were documented and evidenced by written agreements, whether the loans provided for interest payments, and whether actual repayments were made. See ; *10 ; ;
We note that petitioner was a particularly credible and forthright witness, and the facts available to the Court, although somewhat sparse, corroborate her testimony. Petitioner intended to repay Edward when her store's financial condition improved. Petitioner's family members expected her to repay their loans at her earliest convenience, and they would sometimes only advance her money on a short-term basis. With respect to petitioner's bank loans, it is apparent that the bank also expected to be repaid and that petitioner was obligated to do so. The loans were made to petitioner to enable her to relocate her liquor store, to pay the expenses of the store and to keep it operating. When petitioner received the loans she used the proceeds for those purposes. We find therefore that there was a business purpose for the loans. The loans were documented although in an informal manner, and the bank loans were at arm's length. Certainly, some provisions of the loans from relatives and of the loans from *11 Edward suggest that those loans were not made at arm's length. With regard to repayment of the loans, petitioner repaid the bank loans and some of the loans that she received from her relatives. She repaid her sister-in-law and her daughter-in-law, and she partially repaid her brother. The fact that petitioner did not repay Edward is just one factor in the determination of whether those funds were loans. Based upon our review of the evidence and of the witnesses who testified, it is our conclusion that the funds in question did constitute non-taxable loans to petitioner. [2] In light of our conclusions, the additions to tax under section 6653(a) are inapplicable to petitioner. Because of concessions, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years at issue.↩
2. The extent to which discharge of indebtedness income under section 108 may have arisen from petitioner's failure to repay some of the loans and from the failure of the creditors to seek repayment of some of the loans has not been alleged and is not before us.↩